# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

WILLIAM COALE,

               Plaintiff,

   v.

METRO-NORTH RAILROAD COMPANY,

          Defendant.

3:08-CV-01307 (CSH)

## MEMORANDUM AND ORDER

**HAIGHT**, Senior District Judge:

## I.  INTRODUCTION

Plaintiff William Coale brought this action against Metro-North Railroad Company ("Metro-North") pursuant to the Federal Employers' Liability Act (or "FELA"), 45 U.S.C. §§ 51-60, for injuries sustained while employed as an assistant conductor by Metro-North.  Metro-North has in turn filed a third-party complaint against New Haven Parking Authority ("NHPA") seeking indemnification from NHPA from Coale's claim of negligence.

Metro-North has moved for summary judgment dismissing Coale's negligence claim. [Doc-38].  NHPA has moved for summary judgment dismissing Metro-North's third-party complaint and granting its counterclaim against Metro-North for breach of contract. [Doc-41].   Coale has moved for spoliation of evidence sanctions against Metro-North. [Doc-58].  This Ruling resolves all three motions.

## II.  BACKGROUND

The events giving rise to this litigation occurred near the start of Coale's shift at the Union Station in New Haven.  All Train and Engine employees on March 18, 2008, at Metro-North, in

whose ranks Coale was counted, were required at the beginning of the workday to view certain bulletins and operating instructions and record their attendance in a register book.  The room designated for this purpose was commonly referred to as the "register room."  It was generally accessible only by way of a key pad located on its outside, the security code to which was known only to Metro-North or NHPA employees. [Doc. 44-1] at  ¶ ¶ 7, 26.

Coale entered the register room at the start of his shift around 3:17 in the afternoon. [Doc. 41-1] at 31-32.  After using the computer system, which was also located in the register room, Coale sat down at the register room table.  Realizing that he had forgotten to record his attendance, Coale rose from his seat and walked toward the register book.  He had taken only a few steps before he slipped on a shiny, slippery, and what remains to be unidentified substance. [Doc. 44-9] at 37, 41-43; [Doc. 44-1] at ¶ 29.  The accident left Coale badly hurt.

Coale thereafter filed this action against Metro-North seeking damages for his injuries.  The lawsuit prompted Metro-North's third-party complaint against NHPA seeking indemnification against any judgment rendered against Metro-North on grounds that NHPA is responsible for keeping the register room in a safe condition.

The space at Union Station where Metro-North maintains its offices, including the register room, was operated by NHPA and rented to Metro-North pursuant to the terms of a certain lease agreement ("Lease Agreement").  Section 8 of the Lease Agreement provides that Metro-North will indemnify NHPA for injuries occurring to persons on the premises under certain circumstances.  Section 9 of the Lease Agreement provides that NHPA will provide certain utilities and janitorial services.  [Doc. 41-13] Ex. I, at §§ 8-9.  Pursuant to its obligation under the Lease Agreement to furnish janitorial services, NHPA had a practice of cleaning the register room once daily between

6:00 p.m. and 10:00 p.m. and inspecting the register room the following morning before 6:30 a.m. [Doc. 41-11] at 6, 8, 10-11.

### III.   STANDARD OF REVIEW

The standards for summary judgment are familiar.  Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  F. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986).  The role of a district court in considering a motion for summary judgment is therefore "not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists."  *In re Dana Corp.*, 574 F.3d 129, 151 (2d Cir. 2009).  The moving parties, in this case Metro-North and NHPA, bear the burden of showing that they are entitled to summary judgment.  Once a movant has satisfied this burden, in order to defeat the motion the party opposing summary judgment, in this case the Plaintiff, "must set forth specific facts demonstrating that there is a genuine issue for trial."  *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir 2009) (internal quotation marks omitted).  A dispute about a genuine issue of fact exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

In making its determination on a summary judgment motion, a trial court will resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 274 (2d Cir. 2009).  It is "[o]nly when reasonable minds could not differ as to the import of the evidence" that summary judgment is proper. *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991).  When "a motion for summary judgment is

properly supported by documentary and testimonial evidence . . . the nonmoving party may not rest upon the mere allegations or denials of his pleadings, but rather must present significant probative evidence to establish a genuine issue of fact." *Marczeski v. Gavitt*, 354 F.Supp. 2d 190, 193 (D. Conn. 2005) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986)).

In order to present a "genuine issue of material fact" the nonmoving party must therefore present contradictory evidence "such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248.  Consequently the nonmoving party must present affirmative evidence in order to defeat a properly supported summary judgment motion.  As the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment," *Id.* at 247-48, if the nonmoving party submits evidence that is "merely colorable," summary judgment may be granted.  *Id.* at 249-50.  In sum, a "complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v.  Catrett,* 477 U.S. at 322.

### IV.  LEGAL DISCUSSION

**A.     Metro-North's Motion for Summary Judgment**

Metro-North claims that summary judgment must be granted because there is no evidence to support a finding that it had actual or constructive notice of the dangerous condition of which Coale complains— the accumulation of the wet substance that gave rise to Coale's fall.  In support of this claim Metro-North argues that NHPA, which had responsibilities under the Lease Agreement to provide janitorial services, was not its agent within the meaning of FELA, such that the negligence of NHPA would be imputable to Metro-North as its principal.

**1.     Federal Employers' Liability Act**

The FELA is a broad remedial statue that must be construed liberally in order to effectuate its purposes. *Marchica v. Long Island R.R. Co.,* 31 F.3d 1197, 1202 (2d Cir.1994). It provides that:

> Every common carrier by railroad . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier

45 U.S.C. § 51. The Second Circuit "construes the statute, in light of its broad remedial nature, as creating a relaxed standard for negligence as well as causation." *Corsale v. Delaware & Hudson Ry. Co., Inc.*, No. 1:08cv572 (GLS) (RFT), 2010 WL 3907827 at *2 (N.D.N.Y. Sept. 30, 2010) (quoting *Williams v. Long Island R.R. Co.,* 196 F.3d 402, 406 (2d Cir.1999)). However, "FELA is not a strict liability statute, and the fact that an employee is injured is not proof of negligence." *Williams v. Long Island R.R. Co.,* 196 F.3d at 405 (citations omitted). "FELA does not make the employer the insurer of the safety of his employees while they are on duty. The basis of his liability is his negligence, not the fact that injuries occur." *Corsale v. Delaware & Hudson Ry. Co., Inc.*, 2010 WL 3907827 at *2 (quoting *Capriotti v. Consol. Rail Corp.,* 878 F.Supp. 429, 431 (N.D.N.Y.1995)). Although "the plaintiff's burden in making a showing of causation and negligence is lighter under FELA than it would be at common law," nonetheless "in FELA actions, the plaintiff must prove the traditional common law elements of negligence: duty, breach, foreseeability and causation." *Tufariello v. Long Island R.R.*, 458 F.3d 80, 87 (2d Cir.2006)).

"FELA requires an employer 'to provide its employees with a reasonably safe place to work and this includes the duty to maintain and inspect work areas.'" *Corsale v. Delaware & Hudson Ry. Co., Inc*., 2010 WL 3907827 at *2 (quoting *Sinclair v. Long Island R.R. Co*., 985 F.2d 74, 76 (2d Cir.1993)). "An employer breaches its duty to provide a safe workplace when it knows or should

5

know of a potential hazard in the workplace, yet fails to exercise reasonable care to inform and protect its employees." *Id.* (quoting *Gallose v. Long Island R.R.*, 878 F.2d 80, 84-85 (2d Cir.1989)).

"[R]easonable foreseeability of harm is an essential ingredient of [FELA] negligence." *Id.* (quoting *Gallick v. Balt & Ohio R.R. Co.*, 372 U.S. 108 117 (1963). "Under FELA, the reasonable foreseeability element 'requires proof of actual or constructive notice to the employer of the defective condition that caused the injury.'" *Id.* (quoting *Sinclair*, 985 F.2d at 77).

"In evaluating causation, the question is 'whether the proofs justify with reason the conclusion that e[m]ployer negligence played any part, even the slightest, in producing the injury . . . for which damages are sought.'" *Id.* at 3 (quoting *Rogers v. Mo. Pac. R.R. Co.*, 352 U.S. 500, 506 (1957)); *see also Marchica v. Long Island R.R. Co.,* 31 F.3d at 1270 ("[T]he traditional concept of proximate cause is supplanted by the less stringent standard that there be some causal relation, no matter how slight, between the injury and the railroad's breach of duty."). "These are factual issues and "[a]s with all factual issues under the FELA, the right of the jury to pass on [them] must be liberally construed." *Id.* (citing *Gallose v. Long Island R.R.*, 878 F.2d at 84-85).

"'[T]he Second Circuit has placed a particularly heavy burden on parties seeking summary judgment on FELA claims.'" *Id.* (quoting *Wahlstrom v. Metro-North Commuter R.R. Co.*, 89 F.Supp.2d 506, 514 (S.D.N.Y.2000). "Thus, '[u]nder the FELA, the case must not be dismissed at the summary judgment phase unless there is absolutely no reasonable basis for a jury to find for the plaintiff.'" *Id.* (quoting *Gadsden v. Port Auth. Trans-Hudson Corp.*, 140 F.3d 207, 209 (2d Cir.1998) (internal quotation marks omitted)).

### 2. Agency

In support of its motion for summary judgment, Metro-North claims that any notice NHPA

may have had of the dangerous condition is not imputable to Metro-North because its Lease Agreement with NHPA is insufficient to make NHPA its agent.  It argues that if the Lease Agreement alone can create an agency relationship, then *any* contractual relationship between any employer and employee, or in this case, any lessor and lessee, would suffice to create agency. Metro-North also offers the alternative theory that NHPA may not be found to be its agent because Metro-North did not affirmatively contract for janitorial services; rather, those services were incidental to the Lease Agreement.

Section 51 of FELA imposes liability for injury resulting from the "negligence" of "any officer, agents, or employees" of a carrier.  42 U.S.C. § 51.  In *Sinkler v. Missouri Pacific Railroad Co.*, 356 U.S. 326 (1958), the seminal case interpreting FELA liability as it pertains to agency, the Supreme Court stated that an "accommodating scope must be given to the word 'agents,'" and broadly defined the term to include those individuals or organizations "performing, *under contract*, operational activities of [the] employer" irrespective of their independent contractor status at common law.  *Id.* at 331-332 (emphasis added).

Lower courts have similarly applied an "accommodating scope" in determining what constitutes "operational activities of a railroad."  *Mele v. Metro. Transp. Auth.*, No. 04cv03661(LTS)(THK), 2006 WL 2255080, at *4 (S.D.N.Y. Aug. 4, 2006).  "[C]ases have labeled as 'operational activities' a taxi ride between a work site and the railyard, *Leek v. Baltimore & Ohio Railroad Co.*, 200 F.Supp. 368 (N.D.W.Va. 1962); *Penn Central Corp. v. Checker Cab Co.,* 488 F.Supp. 1225, 1228 (E.D.Mich.1980);  the unloading of freight, *Smith v. Norfolk & Western Railway Co.,* 407 F.2d 501 (4th Cir.); a taxicab ride from a ship docked in a foreign country to the local United States Consul in compliance with a statute, *Hopson v. Texaco, Inc.,* 383 U.S. 262 (1966) (per

7

curiam)[1]; operation of a cafeteria for employees' use, *Moore v. Chesapeake & Ohio Railway Co.,* 493 F.Supp. 1252, 1259 (S.D.W.Va.1980); and the giving of medical assistance to a seaman at sea, *Fitzgerald v. A.T. Burbank & Co.,* 451 F.2d 670, 680 (2d Cir.1971)." *Thomas v. Grigorescu*, 582 F. Supp. 514, 517 (S.D.N.Y. 1984) *aff'd*, 751 F.2d 371 (2d Cir. 1984).

Here, Section 9 of the Lease Agreement between Metro-North and NHPA provides:

> Landlord [NHPA] shall furnish the demised premises for the benefit of Tenant [Metro-North] and without additional charge to the Tenant [Metro-North]: water, gas, electricity, heat and refrigeration (including air conditioning), and *janitorial services*.

[Doc. 41-13] Ex. I, at § 9 (emphasis added). Therefore, pursuant to contract, NHPA agreed to furnish the premises as well as certain utilities and janitorial services for the maintenance of the premises, including the register room. The register room serves a critical function in Metro-North operations. It is where Metro-North Train and Engine employees, including engineers, conductors and assistant conductors, view bulletins and operating instructions, sign into to work to verify that they have read those instructions and use the "Crew Management System" for train status. [Doc. 44-2] at 13-16. It is also where Metro-North assistant conductors calculate their revenue collections and where employees eat lunch and rest and relax between train runs. [Doc. 44-1] at 3-4; [Doc. 44-3] at 35; [Doc. 44-4] at 16. The register room is therefore critical to Metro-Metro. Consequently, the record reasonably supports a finding that the janitorial services necessarily required to keep that area in good order constitute services furnished under contract in furtherance of Metro-North's operational activities. Thus, the Court finds that a jury could reasonably conclude that NHPA is the agent of Metro-North. *See Mele v. Metro. Transp. Auth.*, No. 04cv03661(LTS)(THK), 2006 WL

---

[1]Plaintiffs in *Hopson* were members of a ship's crew. They sued under the Jones Act, which "incorporates the standards" of FELA. *Hopson v. Texaco, Inc.* 383 U.S. at 263.

2255080, at *4 (S.D.N.Y. Aug. 4, 2006) (concluding that an independent contractor, performing under contract, cleaning and janitorial services for the Metropolitan Transportation Authority ("MTA"), may reasonably be found to be performing operational activities of the railroad so as to bring injuries caused by the MTA's negligence within the scope of FELA).

In FELA cases, the third-party's performance of operational activities for the railroad is necessary to support a finding of agency.  It does not follow, as Metro-North claims, that an agency relationship in this context means that *all* employees must be agents of employers or that *all* lessees must be agents of lessors.  The test for the relationships Metro-North imagines are borne at common law.  This distinction was aptly articulated by the court in *Smith v. Norfolk & Western Ry. Co.*, 407 F.2d 501 (4th Cir.1969) in which "the court recognized that [*Sinkler*] merely engrafted upon the law of agency the 'operational activity' doctrine, which is uniquely applicable to FELA actions." *Moore v. Chesapeake & O. Ry. Co.*, 493 F. Supp. 1252, 1256 (S.D.W. Va. 1980) *aff'd*, 649 F.2d 1004 (4th Cir. 1981).  The court explained that the "doctrine of operational activity may be termed constructive agency, i.e., an agency that is nonexistent absent the doctrine" arising "out of a non-delegable duty of care to the employee." *Smith v. Norfolk & Western Ry. Co.*, 407 F.2d at 502.  In this sense, the concept of operational activity extends coverage beyond the scope of ordinary agency as it exists at common law. *Id*.  Metro-North may take heart that the common law principles of agency shall remain undisturbed.

At oral argument, Metro-North advanced the alternative theory that NHPA is not its agent because, unlike every other FELA case in which the court determined that the railroad had contracted for a service in furtherance of its operational activities, "Metro-North did not contract [NHPA] specifically for purposes of carrying out one of its railroad functions." [Doc-66] at 45.

9

Rather, it argues that it contracted for the space at Union Station, and that the janitorial services that NHPA agreed to provide were merely incidental to the agreement. Toward this end, it points out that as lessee of the premises, the janitorial services were never its to give; rather, those services were specifically retained by NHPA pursuant to the terms of the lease agreement. The Court is unable to determine why this rather fine distinction should make any difference in this case. The touchstone of agency for FELA purposes is whether a contract was entered into in furtherance of an operational activity. A reasonable jury could conclude that Metro-North contracted for janitorial services in furtherance of its operational activities. Accordingly, the court cannot conclude that there is no agency relationship between Metro-North and NHPA as a matter of law.

### 3. Notice

Metro-North next claims that summary judgment must be granted because there is no evidence to support a finding that it had notice of the hazard that gave rise to Coale's injuries. The record reveals that a wet substance was on the register room floor prior to Coale's accident, but there is no evidence as to the identity of the substance, how it got there, or who put it there. Coale, for his part, does not claim to know what the substance was, but is certain that it must have been spilled, rather than tracked into the room by a third-party, and that Metro-North, or NHPA as Metro-North's agent, were the ones that did the spilling. Coale claims that in the exercise of reasonable care Metro-North or NHPA should have noticed the substance when it was spilled, if not thereafter, when the register room should have been inspected by Metro-North prior to the start of the work day. Coale therefore contends that Metro-North or NHPA is negligent for spilling the substance and that Metro-North is negligent for failing to inspect the register room after it was spilled. The element of notice is a requirement of success under any theory.

10

The Second Circuit considered the question of notice, albeit outside the FELA context, in *Robinson v. Wal-Mart Stores*, *Inc*., 242 F.3d 367 (2d Cir.2000) . That case involved a plaintiff who slipped on a clear, wet substance on the floor of a Wal-Mart store. Both the plaintiff and the defendant's employees testified that they did not see the substance prior to the plaintiff's fall. The District Court granted summary judgment in favor of Wal-Mart, which the Second Circuit affirmed on the basis that the record was "devoid of any evidence of notice, either actual or constructive." *Id.* The standard it articulated in reaching that conclusion is helpful:

> To avoid summary judgment being entered for defendant in a slip-and-fall negligence case, there must be some proof tending to show [defendant] had either actual or constructive notice of a dangerous condition or that it had created the dangerous condition causing injuries to a [plaintiff]. To constitute constructive notice, a defect must be visible and apparent and it must exist for a sufficient length of time prior to the accident to permit defendant's employees to discover and remedy it. A general awareness that a dangerous condition may be present is not enough to establish liability.

*Id.* (citations and internal quotation marks omitted).

There is beyond any real doubt in this case that Metro-North and NHPA did not have actual notice of the dangerous condition by virtue of being directly notified of the wet substance on the register room floor by an employee or other person. Coale does not contest the conclusion that actual notice was not imparted in this way, but at oral argument stated his position that actual notice may be *inferred* from the fact that Metro-North or NHPA created the dangerous condition giving rise to his injuries. [Doc. 66, Tr. at 29]. I address the possibility of this inference later in this Ruling, but turn first to Coale's secondary argument that Metro-North should have known of the dangerous condition by way of inspection of the register room prior to his accident.

While the record reasonably supports the finding that NHPA regularly cleaned and inspected

11

the register room, Coale claims that Metro-North is liable for not assigning any of its own people to inspect the cleanliness of the register room as well.  [Doc. 41-11] at 6, 8, 10-11.  Under FELA, an employer has a non-delegable duty to inspect the workplace and to take reasonable precautions to protect its employees from possible harm.  *See Sinclair v. Long Island R.R. Co.*, 985 F.2d at 78. Consequently, Metro-North retains a responsibility to keep the workplace safe, even where a third-party provides cleaning services under contract.  Nevertheless, the absence of a regular practice of inspecting work areas for cleanliness does not leave Metro-North liable under a negligence theory, *ipso facto*.  Rather, Coale must establish that in the exercise of reasonable care, Metro-North's inspection of the register room would have revealed the presence of the substance on which Coale slipped.  Coale's claim in this respect turns on the sufficiency of the evidence as it pertains to constructive notice.

In *Holbrook v. Norfolk S. Ry. Co.*,414 F.3d 739 (7th Cir.2005), a case upon which Metro-North relies, the Seventh Circuit addressed the issue of constructive notice in the context of a claim brought by Holbrook against the Norfolk Southern Railway Company ("Norfolk") pursuant to FELA, seeking damages for injuries suffered while employed by Norfolk as a conductor.  Holbrook claimed that as he stepped onto a ladder attached to a railcar, his foot slipped due to an accumulation of grease on the rung.  *Id.* at 741.  He argued, *inter alia*, that Norfolk had constructive notice that the grease was on the rung prior to his stepping on it because company procedure dictated inspection of the cars by railroad employees, and no one other than the inspectors work with those cars before the plaintiff stepped onto the rung of the ladder.  Further, Norfolk argued that the likely source of the grease were pools of oil that had accumulated in the railroad yard.  *Id.* at 742.  In rejecting Holbrook's constructive notice argument, the court reasoned "the substance could have gotten onto

the ladder *between* the railcar's inspection and its contact with Holbrook." *Id.* at 745 (emphasis added).  The court concluded that Holbrook's constructive notice argument must fail because it "rests on mere speculation and conjecture," and affirmed the trial court's decision granting summary judgment to Norfolk.  *Id.* (quoting *Deans v. CSZ Transp.*, *Inc.*, 152 F.3d 326, 330 (4th Cir.1998)); *see also*, *e.g., Haas v. Delaware & Hudson Ry. Co.*, 282 F. App'x 84, 88 (2d Cir.2008) ("vague evidence offered by [plaintiff] on this element is insufficient to reasonably justify a conclusion that [defendant] knew or should have known about a problem").

Even if Metro-North made a regular habit of inspecting the register room, as in *Holbrook*, the wet substance could have found its way onto the register room floor between the time the register room would have been cleaned or inspected by Metro-North and its contact with Coale.  In fact, it is entirely within reason that the wet substance came to be on the register room only minutes before Coale entered the restricted area. *See Budd v. United States*, 3:08cv0131(MRK), 2009 WL 3538648 at 2 (D. Conn. Oct. 23, 2009) (finding that "the record contains absolutely no evidence from which a jury could infer constructive notice" as the drops on the floor upon which plaintiff was injured "could have arrived on the floor a minute and one-half before [plaintiff] slipped").  Moreover, although Coale argues that the diameter of the spill was about 12 to 14 inches wide, the hazard befalling Coale was nevertheless relatively inconspicious compared to the obvious hazards in other negligence cases under FELA where courts have dismissed summary judgment on grounds that the evidence was sufficient to impart constructive notice of the dangerous condition to the defendant. *See Mele v. Metro. Transp. Auth.*, No. 04cv03661(LTS)(THK), 2006 WL 2255080, at *1 (S.D.N.Y. Aug. 4, 2006) (finding that four feet by four feet wet area (twelve feet circumference) "could support a reasonable jury finding that the wet condition had been in the lobby . . . long enough to impart

constructive notice of the condition"); *Sinclair v. Long Island R.R.*, 985 F.2d at 77(finding that a depression in a bent trap door covering a manhole on which plaintiff fell could allow the jury to "reasonably infer . . . that the condition had existed long enough to impart constructive, if not actual, notice of the defect").   There is no basis in the record to conclude that constructive notice would have been imparted, in the case at bar, to Metro-North through inspection of the register room.

Coale offers the alternative theory that actual notice may be inferred from the defendant's creation of the dangerous condition.   He relies on *Corsale v. Delaware & Hudson Ry. Co., Inc.*, No. 1:08cv572 (GLS) (RFT), 2010 WL 3907827 (N.D.N.Y. Sept. 30, 2010) and *Hairston v. Long Island R. Co.*, 00cv7208 (JCF), 2003 WL 21254196 (S.D.N.Y. May 30, 2003) to support his claim.   In *Corsale*, the plaintiff Corsale brought an action against the Delaware & Hudson Railway Company ("D & H") pursuant to FELA seeking damages for injuries sustained while employed by D & H as a conductor.   Corsale injured his knee when the ground in the railroad yard gave way.   Testimony supported Corsale's position that D & H negligently failed to properly "tamp down and level" the ground in that area, which was disturbed in the course of making track repairs following a derailment near where Corsale was injured.   *Corsale v. Delaware & Hudson Ry. Co., Inc*., 2010 WL 3907827 at 3.   The court rejected D & H's argument that there was no evidence that it had actual or constructive notice of the defective condition.   In denying D & H's motion for summary judgment the court concluded:

> [T]he element of notice is satisfied by [a] defendant's *creation of a dangerous condition*. . . .   Thus were the jury to find that D & H failed to properly tramp and level the walkway so that it could safely support weight– thus creating the dangerous condition– it could also find that D & H had the requisite notice of that condition.

*Id.* (internal quotation marks and citations omitted) (emphasis added).

14

The court relied on *Hairston* in reaching that conclusion.  In that case, Hairston brought an action against Long Island Railroad Company ("LIRR") pursuant to FELA for injuries in an accident while employed by the LIRR as a car repairman.  Hairston was sent to conduct exterior repairs on a railcar on an elevated lift track.  The wheels of the car had not been properly "chocked" by the LIRR's car movers, and as a result the car rolled off the end of the raised track, injuring Hairston.  The court found that "the car was chocked by an LIRR employee other than Mr. Hairston" and that "since the hazardous situation was in fact created by the LIRR, it had actual notice of the condition." *Hairston v. Long Island R. Co*., 2003 WL 21254196  at 5.

Because Coale's theory of notice in this respect and the cases upon which he relies were raised for the first time at oral argument on the summary judgment motions, Metro-North had no opportunity to respond to this argument directly.  In *Holbrook,* however, a case upon which Metro-North generally relies, the Seventh Circuit expressly rejected Holbrook's contention that he need not establish notice if Norfolk was found to have created the dangerous condition itself.  *Holbrook v. Norfolk S. Ry. Co*.,414 F.3d at 745.  In distinguishing the case law upon which Holbrook based his argument, the Seventh Circuit stated, "these cases are inapposite to the case at bar, as the hazards created by the defendants' action or inaction were the *clear cause* of the plaintiff's injuries." *Id.* (emphasis added).  Notwithstanding the fact that Norfolk was on notice of pools of oil in the railroad yard from which the grease may have come, the court stated that "there are myriad of possible ways the substance could have gotten onto the ladder . . . (e.g., splatter from a passing train on adjacent tracks, residue from mounting by another employee)." *Id.* at 745.  Those myriad possibilities gave the court basis to conclude that Holbrook's constructive notice argument was speculative and based on conjecture.  *Id.*  Put differently, the record contained no evidence to support the finding that

Norfolk created the dangerous condition giving rise to Holbrook's injuries and thus no basis to conclude that Norfolk was on notice of the hazard.

On this score, *Corsale* and *Hairston*, upon which Coale relies, are inapposite to the case at bar. In those instances there was evidence in the record that the railroads created the dangerous conditions to which their employees fell victim: In *Corsale*, testimony that the ground in the area of a derailment had not been properly tamped and leveled; in *Hairston*, evidence that the railcar was last chocked by an employee other than the plaintiff. In this case, the provenance of the wet substance on which Coale slipped remains a total mystery. There is simply no evidence that Metro-North or NHPA put it there. Nor is there such a dearth of alternatives, as there was in *Hairston* and *Corsale*, to conclude by way of inference that *only* Metro-North or NHPA could have been responsible for the spill. *See Holbrook v. Norfolk S. Ry. Co.*,414 F.3d at 745 (declining to find that defendant had created dangerous condition on grounds that defendant was not "*clear cause*" of plaintiff's injuries) (emphasis added); *see also Scheerer v. Hardee's Food Systems, Inc.,* 92 F.3d 702, 709 (8th Cir.1996) ("a possessor will be deemed to have had actual notice if it is *affirmatively shown* that an agent or employee of the possessor created the dangerous condition") (emphasis added). Although entry of a security code was required to access the register room, the reasonable possibility exists at a busy train station that someone other than a Metro-North or NHPA employee could have gained entry. The record demonstrates that an outside vendor accesses the register room to service the soda machine, that Amtrak employees pass through the register room to use the bathrooms, and that even members of the public can request access to the otherwise restricted area by contacting authorized personnel via the telephone located outside the room. *See* [Doc. 40-5] at 11 [Doc. 48-1]. Moreover, even if the identity of the substance giving rise to Coale's injuries were known— a point

16

Coale makes in his motion for spoliation of evidence sanctions discussed *infra*— there is still no evidence on this record to conclude that the substance belonged to Metro-North or NHPA, and that they, and not a third party, were responsible for it being spilled.  As a result, there is no legal basis to conclude that Metro-North or NHPA had notice of the substance as creators of the dangerous condition.

### 4.    *Res Ipsa Loquitur*

Conceptually, an absence of notice (actual or constructive) does not bar a claim in all circumstances.  The doctrine of *res ipsa loquitur* "enables a jury presented with only circumstantial evidence to infer negligence simply from the fact that an event happened." *St Paul Fire & Marine Insurance Co*. *v*. *City of New York*, 907 F.2d 299, 302 (2d Cir.1990); *see also Jesionowski v. Boston & Maine Railroad,* 329 U.S. 452, 456, 67 S.Ct. 401, 91 L.Ed. 416 (1947) (concluding that *re ipsa loquitor* applies in FELA cases) .  "The doctrine thus permits a plaintiff to establish a prima facie case without proving the elements usually necessary to state a negligence claim." *Hairston v. Long Island R. Co*., 2003 WL 21254196 at 4.  "This inference is permitted because 'certain occurrences contain within themselves a sufficient basis for an inference of negligence.'" *Id.* (quoting *Dermatossian v. New York City Transit Authority*, 67 N.Y.2d 219, 226, 501 N.Y.S.2d 784, 788, 492 N.E. 2d 1200 (1986).

A plaintiff makes out a prima facie case of negligence under the doctrine of *res ipsa loquitur* that is sufficient for submission to a jury when: (1) the event was of a kind which ordinarily does not occur in the absence of someone's negligence; (2) it was caused by an agency or instrumentality within the exclusive control of the defendant; and (3) it was not due to any voluntary action or contribution on the part of the plaintiff.  *Jesionowski v. Boston & Maine Railroad,* 329 U.S. 452,

17

456, 67 S.Ct. 401, 91 L.Ed. 416 (1947); *Gerard v. American Airlines, Inc.,* 272 F.2d 35, 36 (2d Cir.1959); *Higgins v. Consolidated Rail Corp.,* 638 F.Supp. 254, 256 (D.Conn.1986); *Hairston* 2003 WL 21254196 at * 4.

Coale can satisfy neither the first nor second criteria. Slip and fall cases often occur in the absence of negligence. *See e.g.*, *D'Alessandro v. Woodloch Pines*, *Inc.*, No. 99cv1472 (SAS), 2000 WL 28166, at * 3 (S.D.N.Y. Jan. 14, 2000) (finding that plaintiff who was injured on a bath mat in hotel owned by defendant had not satisfied first prong of the doctrine of res ipsa loquitur as "it can hardly be argued that . . . this type of accident . . . does not normally occur in the absence of negligence) (internal quotation marks omitted); *Beinert v. PGA Tour, Inc.,* No. 98cv1491 (JG), 1999 WL 890579, at * 3 (E.D.N.Y. Sept. 29, 1999) (finding that plaintiff had not satisfied first condition of res ipsa loquitur doctrine because "[f]alling while walking over curbs or other such outdoor borders occurs frequently in the absence of negligence"). Likewise, the possibility that someone other than Metro-North or NHPA could have caused the spill suggests alternative explanations for Coale's injuries such that this Court cannot conclude that Metro-North or NHPA had exclusive control of the substance upon which Coale slipped. *See Dermatossian v. New York City Transit Authority*, 67 N.Y.2d at 227 ("control is insufficient where the proof does not eliminate the activities of a third party"). Thus, Coale will not find the recourse he seeks through the doctrine of res ipsa loquitur.

The Court is sympathetic to Coale's plight. However, on this record, drawing all reasonable inferences in favor of the plaintiff, there is no genuine issue of material fact as to whether Metro-North, or NHPA as its agent, had notice of the dangerous condition giving rise to Coale's injuries. Accordingly, this Court is bound by law to grant to Metro-North's motion for summary judgment.

**B.      Coale's Motion for Spoliation of Evidence Sanctions against Metro-North**

The Court next addresses Coale's motion for spoliation of evidence sanctions against Metro-North.  Coale claims that Metro-North's Accident Investigation Manual required its employees and claim agents to preserve the wet substance upon which Coale slipped and that they willfully destroyed or failed to preserve the substance in violation of that directive.  Coale asks that this Court sanction Metro-North by striking Metro-North's answer, finding Metro-North negligent, or finding that a Metro-North employee spilled the substance on the register room floor.

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve properly for another's use as evidence in pending or reasonably foreseeable litigation."  *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir.1999).  A party seeking an adverse inference instruction based on the destruction of evidence must establish: "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support the claim or defense."  *Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99, 107 (2d Cir.2002) (internal quotation marks omitted).

If the evidence in question is not relevant to a claim or defense, so that the third element cannot be satisfied, a court need not reach the first two.  *Kullman v. New York*, No. 8:07cv16 (GLS) (RFT), 2012 WL 1142899 (N.D.N.Y. Apr. 4, 2012).  Coale argues that he was prejudiced because the substance, had it been preserved, could have been tested in order to determine its identity, and possibly to ascertain that it was a substance used by Metro-North or NHPA.  The flaw in this reasoning is that even if testing revealed the identity of the substance, there is no basis in the record

19

to conclude that it was a substance used by Metro-North or NHPA, let alone that it was they who spilled it.  Thus, even were the identify of the substance known, Coale would be unable to make out a *prima facie* claim of negligence in the absence of evidence establishing that Metro-North or NHPA had notice of the spilled substance by way of having created the dangerous condition or otherwise. The Court cannot conclude that spoliation of evidence sanctions are warranted where, as here, there is no showing that the destroyed evidence would be relevant to those contested issues.  *Kronisch v. United States*, 150 F.3d 112, 127 (2d Cir. 1998) (citing *Stanojev v. Ebasco Services, Inc.,* 643 F.2d 914, 923–24 (2d Cir.1981) (refusing to draw inference, based on nonproduction of personnel records, that the records would have substantiated plaintiff's age discrimination claim, where the nonproduction bore "no logical relationship to a finding of age discrimination" because "the documents [were] from a time period prior to [plaintiff]'s assumption of the position from which he was discharged"); *Skeete v. McKinsey & Co.,* No. 91 Civ. 8093, 1993 WL 256659, at *7 (S.D.N.Y. July 7, 1993) (refusing to draw adverse inference where party had "not demonstrated prejudice from the denial of access to the destroyed or lost materials" because it had "fail[ed] to provide any extrinsic evidence that the subject matter of the lost or destroyed materials would have been unfavorable to [the opposing party] or would have been relevant to the issues in this lawsuit")).

There is nothing in Coale's theory of evidence spoilation to alter the Court's conclusion that Metro-North is entitled to summary judgment as a matter of law.

## C.   NHPA's Motion for Summary Judgment

The Court next addresses NHPA's motion for summary judgment dismissing Metro-North's claim for indemnification and granting its counterclaim against Metro-North for breach of contract. Because the Court has granted Metro-North's motion for summary judgment as to Coale, Metro-

North's claim for indemnification from NHPA is denied as moot.  The Court addresses only NHPA's motion for summary judgment with respect to its counterclaim against Metro-North for breach of contract.

"To establish a claim for breach of contract, the [moving party] bears the burden of establishing the formation of an agreement, performance by one party, breach of the agreement by the other party and damages."  *NCM Contracting Grp. LP v. Asset Recovery Grp., LLC*, No. 3:11cv1753 (SRU), 2014 WL 2480000, at * 3 (D. Conn. June 3, 2014) (internal quotation marks omitted).  Where, like here, "the language of the contract is clear and unambiguous, the contract is given effect according to its terms."  *Id*.  The parties disagree only as to whether Metro-North breached certain provisions of the Lease Agreement.

To this end, NHPA claims that Metro-North breached its contractual obligations under the Lease Agreement in two ways.  First, NHPA argues that Metro-North breached Section 7 of the Lease Agreement by failing to keep the register room clean.  Second, NHPA argues that Metro-North breached Section 8 of the Lease Agreement requiring Metro-North to indemnify NHPA.

With respect to the former, the lease provides that Metro-North will:

> keep the demised premises in good condition . . . [and] keep said demised premises and all parts thereof in a clean and sanitary condition and free from trash, inflammable material and other objectionable matter.

[Doc. 41-13] Ex. I, at § 7.  NHPA argues that Metro-North has breached this provision by allowing the wet substance on the register room floor to go unnoticed.  Metro-North argues there is a genuine issue of material fact as to who was responsible for discovering and cleaning the unidentified substance.  It points to Section 9 of the Lease Agreement, *supra*, which requires NHPA to provide janitorial services, and Section 11 of the Lease Agreement, which states that NHPA will "furnish

21

the utilities described in Section 9," which it claims includes janitorial services, "during the full 24-hour, seven day per week period."  [Doc. 41-13] Ex. 1, at §§ 7, 9, 11.  Metro-North argues that NHPA's obligations as defined in the Lease Agreement are directly supported by the testimony of NHPA's workers, and that NHPA even concedes that it was required to provide janitorial services. [Doc. 40-6] at 39, 43-45; [Doc. 40-7] at 13-14.  Metro-North also argues that pursuant to a certain Lease and Funding Agreement between the State of Connecticut, the City of New Haven and NHPA, NHPA is responsible for "cleaning," "maintenance of . . . grounds," and for making "all repairs, renewals, and replacements necessary to maintain a first-class facility."  [Doc.46-2] at 33, § 7.1.

NHPA does not state the relief it seeks for its breach of contract claim in this respect, nor is it clear to the Court how NHPA has been harmed by the mere existence of the wet substance on the register room floor.  Nevertheless, it is axiomatic that "for any breach that has occurred, be it large or small, 'partial' or 'total,' an action can be maintained and the law will give it appropriate remedy." Corbin, Contracts, § 948 at 929 (1952); *see also UV Indus., Inc. v. Sharon Steel Corp.*, 631 F. Supp. 1219, 1221 (S.D.N.Y. 1986) ("In the event of a breach, the wronged party is entitled at least to recover nominal damages.").  However, in light of the conflicting evidence in the record, including the unambiguous language of Section 7 and Section 9 of the Lease Agreement, which suggests that both Metro-North and NHPA bear responsibilities for keeping the premises clean, the Court finds that there is a genuine issue of material fact with respect to NHPA's claim of breach of contract as it relates to Section 7 of the Lease Agreement.  Accordingly, NHPA's motion for summary judgment is denied on this count.

The Court turns next to NHPA's argument that Metro-North breached the indemnification provision of the Lease Agreement.  Section 8 of the Lease Agreement provides that Metro-North

22

agrees:

> to indemnify and save [NHPA] harmless from all damages, costs, expenses, judgments, claims and liability for . . . injuries to persons occurring in or about the demised premises except where the negligence or purposeful act of [NHPA] is the sole cause of said loss or damage to property or injury to persons.

[Doc. 41-13] Ex. I, at § 8.  NHPA argues that Metro-North has breached this contractual provision by bringing a claim for indemnification against NHPA, and that NHPA is entitled to legal fees incurred to date in this litigation. [Doc. 66] at 60-61.  Metro-North argues that the indemnification provision is void as a matter of public policy pursuant to Connecticut General Statutes § 52-572k, and as a result, it cannot be found in breach of a contractual term which is itself invalid.

"The purpose of [§ 52-572k] is to nullify any provision in *construction contracts* which grants immunity to either party for acts of negligence." *Monge v. Classic Roofing*, *Inc.*, No. CV 09 5012022, 2011WL 1367066, at *7 (Judicial District of Stamford-Norwalk) (March 22, 2001) (emphasis in original; internal quotation marks omitted).  Section 52-572k (a) provides in relevant part:

> Any covenant, promise, agreement or understanding entered into in connection with or collateral to a contract or agreement relative to the construction, alteration, repair or maintenance of any building, structure or appurtenances thereto . . . that purports to indemnify or hold harmless the promisee against liability for damage arising out of bodily injury to persons . . . by or resulting from the negligence of such promisee, such promisee's agents or employees, is against public policy and void.

Conn. Gen.Stat. § 52-572k(a) (West 2002).  If applicable in this case, the statute would render the indemnification provision of the Lease Agreement unenforceable.[2]  Metro-North argues that § 52-

---

[2]For a comprehensive explication of General Statutes § 52-572k and application to indemnification provisions where one or both parties are found liable for damages, see the

572k applies to contracts, like the Lease Agreement, that pertain to building maintenance.

The Connecticut Superior Court considered the applicability of § 52-572k to an exculpatory provision of the sort at issue here in a lease agreement between the lessor and lessee in *Phoenix Ins. Co. v. Town of Vernon*, No. CV 07 044025148, 2007 WL 196405 (Judicial District of Hartford) (Jan. 5, 2007). In that case, the lease provided that "the Landlord, at its own cost and expense, shall pay for all major repairs and improvements to plumbing and heating systems." *Id.* at 4. The court recognized that "an argument could be made" that this qualifies as "maintenance" within the meaning of the statute, but noted that "neither the courts nor the legislature have interpreted § 52-572k in this manner." *Id.* The court stated:

> [t]he title of § 52-572k, "Hold harmless against public policy in certain construction contracts," clearly suggests that application of the statute was intended to be limited to construction contracts . . . In construing a statute, the title of the legislation is an aid to statutory construction . . . The legislature, in specifically outlawing hold harmless agreements in the construction industry, showed an intention that such a practice not be deemed against public policy in other situations . . . The legislative history of § 52-572k also supports the conclusion that it is strictly applicable to construction contracts which relieve a person from liability from his negligence.

*Id.* quoting *Travelers Indemnity Co. v. Sonitrol Security*, No. CV 04-4001676, 2006 WL 932425, at *2 (Judicial District of Hartford) (March 24, 2006); *see also Albany Ins. Co v. United Alarm Services, Inc.*, 194 F.Supp.2d 87, 95 (D.Conn. 2002) (stating "application of [§ 52-572k] was intended to be limited to construction contracts"). Noting the legislature's intent to outlaw exculpatory provisions in the construction industry and not elsewhere, the Connecticut Appellate Court remarked: "Rather than buttressing the argument of voidness [in other situations] on public

---

thoughtful Opinion of Superior Court Judge Beach (as he then was) in *Patt v. Metro. Dist. Comm'n*, No. CV 04 4003558s, 2006 WL 3878083, at *3 (Judicial District of Middlesex) (Dec. 20, 2006).

policy grounds, the effect of this statute is just the opposite." *Burkle v. Car & Truck Leasing Co.*, *Inc.*, 1 Conn. App. 54, 58, 467 A.2d 1255, 1257 (1983).

Metro-North cites no authority holding that an indemnification provision of a lease agreement where the lessor agrees to provides utilities and janitorial services to the lessee, is a contract pertaining to building maintenance within the meaning of § 52-572k.  The absence of authority is not surprising given the clear intent of the Connecticut Legislature only to nullify exculpatory provisions in construction contracts.  Accordingly, the Court finds as a matter of law that Section 8 of the Lease Agreement is valid and that Metro-North by virtue of leveling this litigation against NHPA is in breach of the same.

## V.  CONCLUSION

For the foregoing reasons, the Court resolves the pending motions in the case as follows:

1.  Metro-North's [Doc. 38] Motion for Summary Judgment is GRANTED.

2.  Coale's [Doc. 58] Motion for Spoilation of Evidence Sanctions is DENIED.

3.  NHPA's [Doc. 41] Motion for Summary Judgment is GRANTED IN PART AND DENIED IN PART.  Its motion granting its counterclaim for breach of Section 7 of the Lease Agreement is DENIED.  Its motion granting its counterclaim for breach of Section 8 of the Lease Agreement is GRANTED as to liability only, NHPA having submitted no proof as to the amount of any damages.  Such proof must be submitted not later than August 29, 2014, following which the Court will enter judgment for NHPA and against Metro-North in the nominal sum of $1.00.

It is SO ORDERED.

Dated:  New Haven, Connecticut
        July 28, 2014

/s/ *Charles S. Haight, Jr.*
Charles S. Haight, Jr.
Senior United States District Judge